In re EASTERN CONTINUOUS FORMS, INC. Debtor.

Lawrence J. Lichtenstein, Trustee, Plaintiff,

v.

Add B. Anderson, Jr., Keybis Corporation, Defendants.

Bankruptcy No. 00–31757 SR. Adversary No. 2–745.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 9, 2003.

---

Kevin P. Callahan, Philadelphia, PA, U.S. Trustee.

Jay G. Ochroch, Philadelphia, PA, for trustee.

Andrew C. Kassner, Drinker, Biddle & Reath, Francis J. Lawall, Philadelphia, PA, Mark Lee, Greenwich, CT, Dean M. Schwartz, Stradley, Ronan, Stevens & Young, LLP, Philadelphia, PA, Myles R. Wren, Nogi, Appleton, Weinberg & Wren, Scranton, PA, for creditor.

Steven P. Rath, Esquire, Rosenn, Jenkins & Greenwald, LLP., Wilkes–Barre, PA, for debtor.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

The Plaintiff in this adversary action is the Chapter 7 Trustee of the corporate Debtor, Eastern Continuous Forms, Inc. ("ECF") In this action the Plaintiff/Trustee seeks aggregate damages of approximately $4,000,000, jointly and severally, from the corporate Defendant, Keybis Corporation ("Keybis") and its sole shareholder, Add B. Anderson, Jr., ("Add

Anderson")[1] The Trustee's claims against Keybis are based in the first instance on Keybis' alleged breach of certain warranties and representations contained in an asset purchase agreement (the "Asset Purchase Agreement") between itself and ECF, and in turn on Keybis' obligation under that agreement to indemnify ECF for any such breach. The Trustee's claims against Add Anderson, individually, are predicated on what is known as the "participation theory" of liability. Pursuant to this theory, a corporate officer who participates in the wrongful acts of a corporation may sometimes be held personally liable for those acts.

Keybis and Add Anderson make several responses to the Trustee's claims, some of which were detailed in the Court's Opinion and Order of February 27, 2003, which denied the Co-defendant's motion for summary judgment. To recapitulate these responses, Defendant Keybis insists that at no time has there been a breach of any warranty or representation found in the Asset Purchase Agreement. Further, says Keybis, even assuming there to have been, the present claim of indemnification for related damages is untimely under the agreement and unsustainable for that reason alone. Finally, Keybis contends that even if a timely breach of warranty or representation can be demonstrated, at trial the Trustee failed to prove damages in any amount and should therefore take nothing on his complaint. For his part, Defendant Add Anderson maintains that, as a matter of fact, he personally did nothing improper in connection with the trans-

action which underlay the Asset Purchase Agreement, but equally as important, that as a matter of law the "participation theory" of liability is not cognizable under applicable non-bankruptcy law in the context of a suit which sounds in contract. Add Anderson demands judgment in his favor on these bases, but argues also in the alternative that the Trustee's complaint is untimely and that he has shown no recoverable damage.

Trial of this action was held June 23, 24, and 30, 2003, although the last of the parties' post-trial memoranda of law was not received until October 10, 2003.[2]

The Court has carefully studied the voluminous record and the parties' lengthy written submissions. For the reasons which follow, the Court concludes that the Trustee's causes of action have been timely asserted. The Court further finds in favor of the Trustee on the issue of liability as to both Keybis and Add Anderson. Judgement will accordingly be entered in favor of the Trustee against both Defendants, although damages will be awarded in an amount less than the Trustee seeks.

*Background.*

Several relevant and material facts are in dispute in this litigation. It is perhaps best therefore to begin with a recitation of those operative facts on which the parties concur. These are stated in Section II of the parties' joint pre-trial statement, as follows:

1. Effective August 31, 1997, Keybis (formerly known as Eastern Continuous Forms, Inc.), as seller, and ECF Acqui-

---

1. Keybis is a party to this action as successor in interest to Eastern Continuous Forms, Inc., before its assets (including its name) were sold to ECF Acquisition Corp., which continued operations under the original company name. For ease of reference the Seller herein will be referred to as Keybis and the Buyer as ECF. The Court also will refer to the Buyer

interchangeably herein as either Buyer, ECF or the Plaintiff.

2. This is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b) and 28 U.S.C. § 157(a) and (b).

sition Corp. (now known as Eastern Continuous Forms Inc.) ("ECF"), as purchaser, entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") whereby Keybis agreed to sell to ECF, and ECF agreed to purchase from Keybis, certain of Keybis' assets in exchange for $2,701,330.00.

2. Add Anderson is the President, sole shareholder and sole director of Keybis.

3. On September 10, 1997, but effective August 31, 1997, ECF and Keybis closed on the Asset Purchase Agreement.

4. In addition to the Asset Purchase Agreement, the parties entered into various related contracts as part of the transaction. These included a Consultation Agreement and a Noncompetition Agreement between ECF and Add Anderson individually, under which Add Anderson personally received $163,336.00.

5. As set forth in Section 6(H)(i) of the Asset Purchase Agreement, Keybis represented and warranted to ECF that "[ e ]xcept as may be expressly set forth in the Disclosure Schedule, [Keybis] has not, since the date of the Current Balance Sheet . . . suffered any material adverse change in its working capital, condition, financial or otherwise, assets, liabilities, customer base, business operations, or prospects . . . ."

6. In Section 6(N) of the Asset Purchase Agreement, Keybis represented and warranted to ECF that Keybis "has no knowledge or basis for knowledge that any customer or broker has terminated or expects to terminate a material portion of its normal business with [Keybis]."

7. In Section 6(Y) of the Asset Purchase Agreement, Keybis represented and warranted to ECF that "[n]o repre-

sentation or warranty by [Keybis] in this [Asset Purchase] Agreement . . . contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements herein or therein not misleading."

8. As set forth in Section 10(A) of the Asset Purchase Agreement, ECF's obligation to consummate the closing was specifically subject to Keybis tendering to ECF a Certificate certifying that, as of the closing, "the representations and warranties of [Keybis] contained [in the Asset Purchase Agreement] . . . shall be true and accurate." At closing, Keybis delivered such a Certificate to ECF.

9. Section 14(C) of the Asset Purchase Agreement states that "[a]ll claims by [ECF] for indemnification must be made, if at all, within a period of twelve (12) months following the Closing . . . ." Section 14(C) further states that "[t]he foregoing time limitations will not apply in the event of a judicial or arbitrator's determination of fraudulent concealment by the Seller."

10. Prior to the closing on the Asset Purchase Agreement, Keybis' largest customer was UARCO, Inc. ("UARCO"), a long-standing customer that accounted for approximately 28% of Keybis' sales.

11. James A. Anderson ("James Anderson"), is a broker in the business forms industry. In 1995, Keybis received one of James Anderson's mass mailings offering his services.

12. In June 1996, after receiving a second mass mailing from James Anderson, Add Anderson met with James Anderson, who explored Add Anderson's interest in selling Keybis, and offered to provide a free, no obligation valuation of the business.

13. On September 10, 1996, Add Anderson forwarded to James Anderson financial information regarding Keybis. In January 1997, Add Anderson received a "mini appraisal" from James Anderson along with a letter apologizing for the delay in providing the valuation.

14. At or around the same time he was discussing the potential sale of Keybis with Defendants, James Anderson also represented a potential purchaser of UARCO.

15. On September 20, 1996, after interviewing several prospects, including James Anderson, Add Anderson retained Kevin Rudd ("Rudd") to locate potential buyers and to broker the sale of Keybis.

16. At Add Anderson's request, Rudd distinguished between "strategic" buyers, *i.e.* companies already in the business forms industry, and "financial" buyers, *i.e.*, companies and individuals outside of the business forms industry, such as ECF and its principals.

17. As a condition of any transaction, Add Anderson prohibited potential buyers from contacting any of his customers, including UARCO.

18. Effective December 31, 1997, Standard Register Company acquired UARCO.

19. Within a few months after the sale of UARCO, ECF lost virtually all of its UARCO business.

20. On September 20, 2000, ECF filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code.

21. On June 21, 2002, the Trustee commenced this adversary action against Add Anderson and Keybis.

For purposes of analysis the Court will synthesize the above agreed facts with other relevant facts established at trial.

The now defunct business to which this litigation pertains involved the printing of business forms and labels. The mainstay of the business at all relevant times consisted of overflow orders received from other business forms companies; which is to say that Keybis' customers sent it jobs which they could not perform for their own customers because their production facilities were operating at or near full capacity. As noted above, among Keybis' long standing customers was a corporation known as UARCO, Inc. UARCO had historically accounted for approximately 28% of Keybis' sales. Shortly after the Keybis/ECF asset sale, however, ECF lost virtually all of the business previously done with UARCO. The termination of the UARCO/ECF relationship is central to the present dispute.

UARCO discontinued placing orders with ECF in the Spring of 1998 because its American label division had been sold and the new owner, Standard Register, had consolidated operations and implemented a new policy of keeping its business forms printing in-house. The sale to Standard Register had been preceded by a sale of all of UARCO's Canadian operations, and it is clear that the sale of the American label division to Standard Register was anticipated by those knowledgeable in the industry. As will be discussed *infra*, the Court has little doubt that knowledge that a sale of the American label operations of UARCO was likely forthcoming, and the failure to disclose it in connection with the sale of Keybis' assets to ECF, would constitute a breach of the warranties and representations contained in the Asset Purchase Agreement. The Defendants assert, however, that they had no such knowledge. At the risk of resorting to an overworked phrase, the Court observes that one question thus becomes "what did the Defendants know and when did they know it?" A review of the record compels the conclusion that important relevant information

was well known to the Defendants before the sale, but was deliberately withheld by them.

Keybis was founded in the early 1960s. It was co-owned by Defendant, Add Anderson and a partner until 1994, at which time Mr. Anderson's partner expressed an interest in retiring; whereupon Mr. Anderson purchased his partner's interest and became the Company's sole shareholder. By late 1995, Mr. Anderson had decided to scale back his own involvement in the business and he began to investigate its sale. He first approached Brown Brothers Harriman, which declined involvement, but referred him to a company called Curtis Financial Group and its president Kevin Rudd. On April 4, 1996, Rudd sent Anderson a proposal (Exhibit P–3) pursuant to which Curtis would value the business and, at Anderson's election, market it for sale. Anderson did not immediately sign and return the contract, stating at trial that he was in no hurry, enjoyed working, and was interviewing other brokers. One such was an individual named James Anderson, the president of a company known as Corporate Development Associates.

Add Anderson had received "mass mailings" from James Anderson in October 1995 and April 1996, (Exhibit P–34 and P–35), offering his company's services in the event a recipient had thoughts of selling a business. Although they disagree over who made the next move, Add Anderson and James Anderson agree that they spoke by telephone in the Spring of 1996. Their versions of what followed sharply conflict. James Anderson says that after conversation of a general nature, the two made plans for James Anderson to come to Philadelphia on June 13, 1996. James Anderson says that he and Add Anderson met for breakfast at about 8:00 a.m. on June 13th at the Marriot Hotel in West Conshohocken, and then traveled to the Keybis plant in Montgomery County for a tour and further talks. Add Anderson, in contrast, says that James Anderson told him he was coming to the Philadelphia area on June 13, 1996 to visit another client, and that he would like to stop by. Add Anderson says that the two met for the first time at about 11:00 a.m. at the Keybis plant, and that a breakfast meeting at the Marriot Hotel was never discussed and did not occur. Other things being equal, this discrepancy might be of only passing significance. It cannot lightly be dismissed, however, in view of other pivotal details concerning their dealings over which the two disagree. The Court will return to these, but it will first round out the chronology of the Keybis/ECF sale transaction.

Following their meeting in June 1996, James Anderson sent Add Anderson a request for written financial information for the purpose of preparing a valuation estimate for Keybis. (Exhibit P–37) Before providing the information, Add Anderson had James Anderson sign a confidentiality agreement. (Exhibit P–38). In January 1997, James Anderson provided an appraisal of the business which estimated its value at between $2,500,000 and $3,500,000, exclusive of the plant building and the roughly 17 acre tract on which it sat. (Exhibit P–40)

In the meantime, Add Anderson had agreed to the proposal made to him by the Curtis Financial Group. His signed acceptance thereof on September 20, 1996 is Plaintiff's Exhibit 4. In October 1996, Curtis furnished Anderson with a "confidential memorandum" (Exhibit P–5 and P–6) that profiled the Company's history and estimated its value at between $2,400,000 and $3,400,000, exclusive of realty and improvements, which were separately valued in the aggregate at $2,000,000. Anderson

told Rudd that he wished to go forward with a sale of the company.

In March 1997, Rudd sent Anderson a list of 32 potential buyers he had identified, (Exhibits P–20, 21, and 22), distinguishing between 25 "strategic buyers," i.e., individuals, or entities already in the business forms printing industry, and 7 "financial buyers" who were not. One of the potential strategic buyers was a company called Quick Tech Business Forms from Springboro, Ohio. Add Anderson was already acquainted with Quick Tech, and its president Chris Felker, through James Anderson, who had recently represented Felker in the latter's acquisition of a business called Continu Forms in Kulpsville, Pennsylvania. At some point between their first conversation and the January 15, 1997 appraisal of Keybis by Corporate Development Associates, James Anderson had identified Felker to Add Anderson as a possible acquirer of Keybis.

By February 1997, Felker had expressed an interest in acquiring Keybis. (See Exhibit P–16) By letter dated March 26, 1997 (Exhibit P–23) Felker requested a thirty day option within which to buy the business on terms outlined in the letter. The proposed purchase price was $2,250,000. Of note is the fact that Keybis would stand to receive an additional contingency payment of $75,000 annually if sales to UARCO during the preceding 12 months averaged at least $167,000 per month. By letter dated April 30, 1997 (Exhibit P–7), Felker amended his offer in certain respects, including the contingency payment, which was converted to a sliding percentage of annual sales to UARCO for three years after closing. After additional negotiations with Add Anderson, Felker further amended his offer by letter dated May 12, 1997 (Exhibit P–29), once again adjusting the contingency payment relative to UARCO sales. Of additional note is the fact that, prior to the receipt of the earliest of the foregoing purchase offers, Add Anderson had renegotiated with Kevin Rudd the fee that would be payable to Curtis Financial Group upon a sale of Keybis to provide for a reduced fee in the event the Company should be sold to Quick Tech. (See letter of March 3, 1997— Plaintiff's Exhibit P–9).

The assets of Keybis were not sold to Quick Tech. They were eventually sold instead to an individual named Philip Moseman and his partner, John Randolph. Moseman had been identified by Kevin Rudd as a potential buyer in his letter to Add Anderson in March 1997. Moseman had signed a confidentiality agreement in March 1997 and had been sent the confidential memorandum prepared by Rudd. Thereafter, Moseman proceeded with a "due diligence" investigation. This process consisted of an evaluation of financial information about the Company, a tour of the plant, and discussions with Kevin Rudd, Add Anderson, and Alan Anderson (no relation), who was the Keybis salesperson in charge of the UARCO account. The discussions included inquiry into the customer base of Keybis.

Moseman requested the names of the Company's larger customers, but initially his request was refused. The refusal was attributed to Add Anderson's concern that contacts between a potential buyer of the Company and the Company's larger customers would have a deleterious effect on account relationships if the sales transaction failed to occur. Eventually the identity of the Company's larger customers, including UARCO, was disclosed to Moseman, although contact with customers, including UARCO, was strictly prohibited. Despite this constraint, Moseman and Randolph, who were financial buyers as that term is used herein, elected to pursue an acquisition. On May 21, 1997, Moseman

forwarded a letter of intent to Kevin Rudd (Exhibit D–1) setting forth an offer to purchase the assets of Keybis for $2,400,000 subject to various terms and conditions, among which were the signing of an Asset Purchase Agreement acceptable to both parties and further due diligence. In the latter respect Moseman, by letter dated May 28, 1997, requested numerous additional items of information about the Company. (Exhibit D–2). By August 1997, negotiations were concluded and on August 31, 1997 an Asset Purchase Agreement (Exhibit B to Plaintiffs Ex. P–2) was executed. The purchase price was $2,701,330.

At trial, Moseman testified, credibly, that the Asset Purchase Agreement contained various representations and warranties, including certain ones which were specifically included as a consequence of the limitations which had been placed on customer contacts. This testimony was unrebutted. In this respect, the Agreement provided, in pertinent part:

6. REPRESENTATIONS AND WARRANTIES OF THE SELLER

> Except as otherwise set forth in the Disclosure Schedule attached to this Agreement ("Disclosure Schedule"), the Seller represents and warrants to the Purchaser as set forth below:
> ... H. Absence of Certain Changes. Except as may be expressly set forth in the Disclosure Schedule, Seller has not, since the date of the Current Balance Sheet:
>> (i) suffered any material adverse change in its working capital, condition, financial or otherwise, assets, liabilities, customer base, business operations or prospects;
> ... N. Distribution and Customers. To the Seller's best knowledge, it enjoys good working relationships under all of its distributor, sales representative, broker and similar agreements necessary to the normal operation of its business. The Seller has no knowledge or basis for knowledge that any customer or broker has terminated or expects to terminate a material portion of its normal business with the Seller.
> ... Disclosure. No representation or warranty by the Seller in this Agreement or any of the other Acquisition Documents (including, without limitation, the Disclosure Schedule), contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements herein or therein not misleading.

*See* Asset Purchase Agreement, ¶ 6.

In addition to the Asset Purchase Agreement between ECF and Keybis, Add Anderson contemporaneously entered into separate consulting and non-competition agreements with ECF. Under the three year consulting agreement, Anderson was to receive $4,166.00 per month. Under the non-competition agreement, Anderson was to receive $1,666.00 per month for a period of 60 months. As noted, above, Add Anderson was paid an aggregate of $163,336 pursuant to these agreements prior to the institution of this litigation.

Also, as noted above, effective December 31, 1997, the Standard Register Company acquired UARCO, and a few months later ECF lost virtually all of its UARCO business. This development was an economic catastrophe for ECF and sent it into a downward spiral from which it would not recover. On September 9, 2000, the Company filed for relief under Chapter 7 of the Bankruptcy Code. The gravamen of the present litigation goes to the Plaintiff's claim that at all relevant times, Keybis and Add Anderson 1) were aware that the UARCO Company was in financial straits and that UARCO's American label division

would likely be sold, 2) were required to disclose what they knew to ECF pursuant to the warranties and representations in the Asset Purchase Agreement, but 3) intentionally failed to make such disclosures.

*Discussion.*

### A. *Liability on the Part of Keybis*

 At the outset, the Court reiterates its view that prior knowledge of UARCO's financial difficulties and likely sale fall squarely within the ambit of the representations and warranties in the Asset Purchase Agreement. This conclusion flows naturally from a plain reading of the relevant text. In fact, the proposition is virtually self-evident. In this regard, the Court notes that the agreement mandated disclosure of any material adverse change in Keybis' customer base or *prospects.* Keybis also warranted affirmatively that it had no knowledge or basis for knowledge that any customer expected to terminate a material portion of its normal business with Keybis. Impending disruption of the UARCO account relationship would clearly qualify as material within the meaning of the Asset Purchase Agreement. On this score, the Court notes Kevin Rudd's testimony that he had never brokered a transaction where a potential 28% loss in revenue would not have represented a material adverse event. In Rudd's view, the basis for "dependency" and hence materiality, was only 10%. James Anderson's testimony as to the importance of the UARCO account to Keybis was consistent with that of Rudd. The first issue for resolution, therefore, is whether the Defendants had knowledge, or a basis for knowledge, as to UARCO's financial condition and planned sale. The Court concludes that each did.

Evidence of this appears from more than one source. There is first the testimony of James Anderson. James Anderson had had involvement in the sale of UARCO's Canadian operations, and he was representing a potential purchaser of the American label division at the same time he met with Add Anderson to discuss providing a valuation estimate. He described UARCO as a highly visible company in the business forms industry, but one that was known to be "hanging by a thread" and on the verge of bankruptcy. He testified that he discussed these facts with Add Anderson during their meeting in June 1996 with particular regard to the impact that a UARCO sale would have on the value of Keybis. Add Anderson categorically denies that any conversation of this type occurred between he and James Anderson, however the Court credits James Anderson's testimony for several reasons.

First, the Court observes that it is entirely logical to assume that such conversation between the two took place. The customer base of Keybis was an integral factor going to its value upon sale. The status of the company's larger accounts would be an obvious area of inquiry and discussion. Given James Anderson's knowledge of the business forms industry, and his involvement with the sale of UARCO's Canadian and American operations, it would have been much more unusual for the subject not to have arisen.

Passing beyond this, the Court notes that James Anderson had no apparent reason to manufacture the testimony in question, the details of which were quite specific. His testimony was made part of the record herein through the introduction of his videotaped deposition. The Court viewed the entirety of the deposition and found James Anderson to be a credible and entirely believable witness. The same cannot be said of Add Anderson. Mr. Anderson struck the Court as an intelligent, sophisticated businessman, but his demeanor and tone in the witness box were defensive and belligerent. His testi-

mony struck the Court as wholly self-serving and utterly disingenuous. On this score the Court returns to Add Anderson's denial of having had a breakfast meeting on June 13, 1996 with James Anderson. Add Anderson also denied any knowledge of James Anderson's plan to stay at the Marriott hotel in Conshohocken, Pennsylvania during his trip. Yet by letter dated May 30, 1996 (Exhibit P–36) James Anderson wrote to Add Anderson for the specific purpose of confirming the upcoming meeting and sharing his travel plans. Add Anderson has no explanation for this completely irreconcilable version of events, other than that James Anderson is lying. The Court rejects this hypothesis in light of the corroborating correspondence, and concludes not only that James Anderson's version of the itinerary of his June 1996 trip is the more accurate, but that so, too, is his recollection of the content of the parties' discussions.

The Court here notes other equally damaging aspects to Add Anderson's testimony. Kevin Rudd, for instance, testified that he was informed by Chris Felker that UARCO's Canadian operations had been sold, and that the American label division was to be sold next. He testified that he had conversation with Add Anderson about Felker's concern that this would lead to a decline in UARCO business for Keybis, but that Add Anderson dismissed the matter as of little consequence. Add Anderson, for his part, again denies having had conversation of any such type with Rudd. (N.T., June 30, 2003 p.80)

Finally, it appears inescapable that Add Anderson had significant conversation with Chris Felker concerning the UARCO account and the possibility of a decline in sales volume. Felker's purchase offer was structured to deal with that very contingency. Yet again, Add Anderson denies having had any such conversation. Ironi-

cally, it appears that the topic of UARCO sales figured in discussions at a breakfast meeting between Felker and Add Anderson. Felker addressed the proposed UARCO contingency payment in a May 12, 1997 letter to Add Anderson following and referencing that meeting. (Exhibit P–29) Just as with the James Anderson breakfast meeting, however, Add Anderson claims that the conversation never occurred and that the meeting did not even take place.

When pressed to reconcile the several glaring contradictions between his testimony and conflicting evidence from disinterested sources, Add Anderson simply insists that anyone with a story different than his is not telling the truth. This explanation is implausible and rings hollow. The weight of the evidence is overwhelming on the point at issue. The Court accordingly finds that Add Anderson, and hence Keybis, were both aware of the financial difficulties of UARCO prior to the execution of the Asset Purchase Agreement, and that they were also aware that UARCO's American label division was likely to be sold. This was information the Seller was required to divulge under the Asset Purchase Agreement, and the Court holds that the Seller's failure to have done so was a clear breach of the parties' contract.

### B. Sellers Indemnification Obligation

The Asset Purchase Agreement sets forth remedies in the event of a breach by the Seller. Specifically, Paragraph 14.B of the Agreement provides as follows:

Indemnification by the Seller. Seller agrees to indemnify and hold the Purchaser and its successors and assigns harmless in respect of any and claims, losses, damages, liabilities, and expenses (including, without limitation, settlement

costs and legal, accounting, and other expenses in connection therewith) (collectively, the "Damages") incurred by the Purchaser and its successors and assigns in connection with each and all of the following:

(i) Any claim by any person or other entity for any broker's or finder's fee or similar fee charged for commission that arises from any action, statement, or commitment made by the Seller or Shareholder.

(ii) Any breach or other failure to perform any covenant, agreement, or obligation of the Seller or the Shareholder contained in the Agreement, any other Acquisition Document or any other instrument, including all certificates, contemplated hereby or thereby.

Asset Purchase Agreement, ¶ 14.B.

Other things being equal the Court would turn to an assessment of damages. The Defendants, however, have renewed certain arguments which they made at an earlier stage of this litigation and which they maintain have a dispositive legal effect as to the issues presented herein. The first of these is that the claims raised by the Plaintiff are untimely and hence barred. On this score, the Defendants rely on the provisions of Paragraph 14.C of the Asset Purchase Agreement, which provide as follows:

C. Time Limitations Purchaser's Claims. All claims by the Purchaser for indemnification must be made, if at all, within a period of twelve (12) months following the Closing, except that:

(i) any claim of a breach of Paragraph 6.R (Environmental) or 13.F (Noncompetition) may be made at any time subsequent to the Closing (and no statute of limitations bar shall be interposed by the Seller with respect to any claim under 6.R);

(ii) any claim of a breach of Paragraph 6.J (Litigation) must be made, if at all, within sixty (60) months following the Closing or such lesser period of time as may be applicable under Paragraph 14.-B.(v) or 14.B.(vi);

(iii) any claim of a breach of Paragraph 6.K (Tax) must be made, if at all, within thirty six (36) months following the Closing; and

(iv) any claim under Paragraph 14.B.(v) or 14.B.(vi) must be made within the time therein stated.

The foregoing time limitations will not apply in the event of a judicial or arbitrator's determination of fraudulent concealment by the Seller.

Asset Purchase Agreement, ¶ 14.C

The Defendant's argument under ¶ 14.C is actually threefold. In the first instance the Defendants argue that the term fraudulent concealment relates only to post sale conduct on the part of the Seller. In the second instance, the Defendants argue that, even if there was a breach of a representation or warranty in the Asset Purchase Agreement, there was never any post sale "fraudulent concealment" thereof. Finally, the Defendants construe the language of limitation in the above paragraph to mean that even if there is a finding of post sale fraudulent concealment on their part, the one year period for the bringing of an indemnification claim is not vitiated, but only tolled until such time as the effects of the fraud have been nullified by knowledge on the part of the Plaintiff. The Defendants maintain that ECF knew or had reason to know of the alleged claims against Keybis at or about the time that Standard Register acquired UARCO's American label division; i.e., December 31, 1997, and that this makes the outside date for an indemnification claim a year thereafter. The Court will address these arguments in turn.

■ The parties disagree over exactly what the phrase fraudulent concealment means for purposes of the present litigation. The Defendants contend that as used in the Asset Purchase Agreement the phrase refers to fraudulent post sale conduct on the part of the Seller designed to conceal from the Buyer information which would inform the Buyer that it possessed grounds for an indemnification claim. The Defendants argue that this is the typical context in which the equitable doctrine of fraudulent concealment arises, and that as a "term of art" the phrase should be accorded its ordinary common law meaning.

The Plaintiff, on the other hand, contends that as used in the Asset Purchase Agreement the term fraudulent concealment refers to, or also includes, any pre-sale concealment of information the Seller was affirmatively required to disclose or confirm to the Buyer. In support of its view the Plaintiff argues that, if the Defendants interpretation were correct, there would have been no need to include the language in the first place, because post ante fraudulent concealment always operates to toll the running of a period of limitation, even if the contract in question does not expressly so state. *See Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 256 (3d Cir.2001) ("Fraudulent concealment is an equitable doctrine [that] is read into every federal statute of limitations.") (*quoting Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir.1993)). The Court finds the Plaintiff to have the better part of this disagreement.

The Defendants cite to *Fischer & Porter Co. v. Porter*, 364 Pa. 495, 500, 72 A.2d 98, 101 (Pa.1950), for the proposition that terms of art are to be given their normal technical meaning. Accepting for purposes of discussion that fraudulent concealment qualifies as a term of art, such as would implicate the rule of construction which the Defendants' urge, the Defendants themselves nevertheless observe that in *Fischer & Porter* the Pennsylvania Supreme Court noted that the rule applied *unless* the context or usage which is applicable indicates a different meaning. The Court finds that caveat to apply here.

On this score, the Court notes that the time limitation in question refers to claims for indemnification for breach of any warranty or representation contained in the Asset Purchase Agreement. The warranties and representations pertain to closing, or pre-closing circumstances. For example, the relevant warranties and representations at issue here relate to the status of the Seller's relationship with its customers, including, in particular, UARCO before sale and at the time of closing. The breach in this instance consists of the Seller's failure to disclose information concerning the pre-closing status of the UARCO account that was in its possession, at or before closing. Importantly, the affirmative disclosure requirements vis-a-vis customer accounts were specifically included in the agreement in response to a restriction on the Buyer's pre-closing rights to contact customers directly. These factors collectively suggest to the Court that the fraudulent concealment reservation in the Asset Purchase Agreement relates not only to post sale concealment of information germane to indemnification claims, but to pre-closing concealment of information which was required to disclosed.

■ This conclusion comports with common sense, because as a practical matter it is difficult to envision what information the Seller could possibly conceal from the Buyer post-closing which would have had anything to do with the Seller's mandatory pre-closing disclosures. Put differently, it is illogical to assume that the parties included language referencing fraudulent concealment by the Seller, intending it to

apply only to a time (after the sale) when there could hardly be any "concealment" of information by the Seller, because there were no further disclosure obligations on the part of the Seller. The phrase fraudulent concealment, in other words, has relevance principally, if not entirely, with respect to information likely to influence the Buyer's decision to close. Also, this interpretation of the agreement comports with another important rule of contract interpretation that the Plaintiff cites; *i.e.*, that a contract should be read to give effect to all of its terms. *See In re Walnut Equip. Leasing Co., Inc.*, 2003 WL 21262710 *9 (Bankr.E.D.Pa.) ("It is hornbook law that in construing a contract a court should give meaning to all its words and phrases and adopt a construction that avoids surplusage."); *Tenos v. State Farm Ins. Co.*, 716 A.2d 626, 631 (Pa. Super.Ct.1998) "( [Pennsylvania law] does not permit words in a contract to be treated as surplusage"); *Wyoming Valley West School District v. Northwest School District* 695 A.2d 949, 953 (Pa.Cmwlth.Ct.1997) ("[N]o provision of a contract should be treated as surplusage or redundant if any reasonable meaning consistent with other parts of the agreement can be given. to it. . . ."). On this score the Court agrees with the Plaintiff that a fraudulent concealment reservation of the sort the Defendants posit would be read into the Asset Purchase Agreement whether the contract stated it or not. Accordingly, rather than render the fraudulent concealment language in the Asset Purchase Agreement mere surplusage, the Court will accord it the meaning heretofore described, which is the most logical interpretation of the text under the circumstances.

 Having concluded that fraudulent concealment as referred to in Paragraph 14.C. of the Asset Purchase Agreement includes pre-closing conduct on the part of the Seller, the Court turns next to the question of whether evidence of fraudulent concealment exists in the present record. On this score, the Defendants observe that in the traditional context in which this equitable doctrine is invoked, the plaintiff bears the burden of proving fraudulent concealment by clear, precise and convincing evidence. *Bohus v. Beloff,* 950 F.2d 919, 925 (3d Cir.1991) (*citing Molineux v. Reed,* 516 Pa. 398, 403, 532 A.2d 792, 794 (1987)); *Miller v. Janney Montgomery Scott, Inc.,* 1998 WL 398146 *2 (E.D.Pa.). "The clear and convincing standard requires evidence that is 'so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts of the issue.' " *Calle v. York Hospital,* 232 F.Supp.2d 353, 360–61 (M.D.Pa.2002) (*quoting Rohm and Haas Co. v. Continental Cas. Co.,* 566 Pa. 464, 781 A.2d 1172, 1179 (2001)). The Court will assume that this burden of proof applies for present purposes as well, but concludes also that this admittedly rigorous burden has been met.

As discussed above, the evidence was exceedingly strong that Add Anderson knew of the financial difficulties of UARCO and that it would likely be sold. He, of all people, would have appreciated the calamitous effect such a scenario would have on the business of Keybis. Yet, no disclosure to the buyers of Keybis was made. The Court holds that the concealment of such vital information, while simultaneously restricting the Buyer's ability to learn the information on its own, was blatantly fraudulent.

The next question presented concerns the proper interpretation to be accorded to the provisions of the Asset Purchase Agreement which govern the time period within which the Buyer is entitled to bring an indemnification claim, with particular

regard to the qualifying language found at the end of ¶ 14. C. In this respect, the Defendants, as noted, argue that if fraudulent concealment is found, the one year time period is tolled until such time as the Buyer knew, or reasonably should have known that it had grounds to assert an indemnification claim. On this score, the Defendants argue that the Buyer was on inquiry notice as to its claims as early as December 31, 1997. The Plaintiff, in contrast, argues that if there has been fraudulent concealment, the temporal time limitation in ¶ 14.C is nullified and does not apply at all. In that event, says the Plaintiff, the normal four year statute of limitations applicable to contract actions applies. 42 Pa.C.S.A § 5525

The Plaintiff observes, too, that at the time a company files bankruptcy any unexpired statute of limitation is extended two years from the date of the order for relief under 11 U.S.C. § 108(a) if that statute would otherwise run out before that date. The Plaintiff calculates therefore that, even assuming the statute of limitations began to run as early as August 31, 1997, (the closing date of the asset sale) the complaint herein, filed June 21, 2002 is timely.

■ In resolving the Defendants' motion for summary judgement the Court held that the text of the Asset Purchase Agreement is latently ambiguous on the point at issue, which is to say that although the language itself is clear, it is capable of being construed in either of the ways the parties have advanced. The Defendants argue that the ambiguity should be resolved in their favor, because the language in question was allegedly drafted by the Buyer and, under established principles of contract law, ambiguities in a contract's text are to construed against the drafter. The Defendants had advanced this same argument in their summary judgement papers, however the Court found that the record was inconclusive as to the question of the agreement's author, hence the question should be held over for trial. The Defendants at this juncture contend that the question of authorship is settled. They say that the record demonstrates that the Buyer was responsible for the language in question, hence the ambiguity in the agreement should be resolved against it and the present cause of action deemed untimely. The Court disagrees. The Buyer was not shown to have solely authored the relevant language in the Asset Purchase Agreement, and the Court therefore rejects the Defendant's request.

■ At trial, Moseman testified, credibly, that he didn't know whose lawyers specifically drafted the text in question, but that in either event it was the product of negotiation between both parties and their respective counsel. John Randolph did not testify at trial, however a single line of his deposition was admitted at trial. In it he states that he thought that his lawyers drafted the documents. Counsel for the Defendants sought to offer testimony at trial from another lawyer from their law firm in furtherance of the question of the draftmanship, however the testimony was excluded under FRCP 37(c)(1), because the Defendants had not previously identified the attorney as a potential witness in their mandatory pretrial disclosures under FRCP 26(a). *See Nicholas v. Pennsylvania State University*, 227 F.3d 133, 148 (3d Cir.2000) (upholding trial court's decision to exclude evidence not disclosed per pretrial discovery as within trial court's discretion).[3]

---

**3.** In *Nicholas,* the Court of Appeals identified four factors to be considered in assessing whether the exclusion of evidence is an appropriate sanction for failure to comply with

Against this thin backdrop the Court finds that the Defendants have failed to demonstrate that the Buyer was responsible for the ambiguous language at issue. At most, the Defendants have demonstrated that Buyer's counsel may have been the scrivener of the Asset Purchase Agreement, or prepared the original draft. At bottom, however, the Asset Purchase Agreement appears to have been the product of arms length negotiation between parties of equal bargaining strength, each of which was represented by able counsel. Under such circumstances the doctrine of *contra proferentum* does not dictate that the ambiguity in question be resolved against the Buyer. *See In re Walnut Equip. Leasing Co., Inc.*, 2003 WL 21262710 *5 (Bankr.E.D.Pa.) (finding no basis to construe Asset Purchase Agreement against trustee where agreement resulted from combined efforts of attorneys for both sides); *Morrisville Borough Police Ass'n. v. Morrisville Mayor and Town Council*, 3 Pa. D. & C.3d 216, 226, 1977 WL 432 (1977) ("[A] rule of construction against the drafter is inappropriate where the contract results from the joint efforts of both sides...."); *Spatz v. Nascone*, 368 F.Supp. 352, 354 (W.D.Pa.1973) ("[W]here a contract is the result of the joint efforts of attorneys or negotiators, then it is not to be construed against either party.")

■ Even were it otherwise, the doctrine of *contra proferentum*, by the Defendants own acknowledgment, provides only that where language in a written document is ambiguous or its meaning doubtful then, in determining the intention of the parties, the writing must be construed most strongly against the party drafting it, *and* the interpretation which makes a rational and probable agreement must be preferred. This, of course, is in keeping with the overarching principle that the Court's role in contract interpretation is first and foremost to give effect to the intentions of the parties. *Mace v. Atlantic Refining & Marketing Corp.*, 567 Pa. 71, 79, 785 A.2d 491, 496 (2001); *O'Farrell v. Steel City Piping Company*, 266 Pa.Super. 219, 220, 403 A.2d 1319, 1324 (1978).

■ Bearing the foregoing caveats in mind, the Court finds that the most rational and probable intended meaning of the language at issue is that the one year time constraint was intended to be vitiated should there be a finding of fraudulent concealment against the Seller. In reaching this conclusion the Court reiterates and emphasizes that this interpretation is the plainest reading of the language and,

discovery duties: 1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; 2) the ability of the party to cure that prejudice; 3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case; and 4) bad faith or willfulness in failing to comply with a Court Order or discovery obligation. Here, the Defendants had ample reason to appreciate the potential need for testimonial evidence on the point of the authorship of the Asset Purchase Agreement as early as February, 2003, when the Court referenced the issue in its Opinion with respect their Summary Judgment Motion. They also had good reason to know who the witness would be. Although the Defendants made reference to possibly calling a witness in the parties' Joint Pretrial Statement, this does not obviate their duty to supplement their mandatory pretrial disclosures so as to place the opposing party clearly on notice of the need to prepare for that eventuality via pretrial discovery. Faced with the issue for the first time at trial, the Plaintiff was at the distinct risk of prejudice, while adjourning the proceeding for additional discovery over halfway through the trial, for the purpose of the taking of additional discovery, would have ill served its orderly and efficient administration. The exclusion, in any event, appears to be of harmless consequence, because the evidence ultimately would have remained to some degree in conflict as to the question of draftsmanship, but much clearer as to the question of joint negotiation.

furthermore, that the passage in question could have been foregone without effect, which is to say that were the passage intended to represent simply a tolling provision, as the Defendants urge, there would have been no need to include it in the first place. The most reasonable interpretation of the clause, as a consequence, and bearing in mind the circumstances under which the language came to be included in the Asset Purchase Agreement, is that the truncated window for the bringing of indemnification claims was a benefit to the Seller bargained for in exchange for the concession that, if the Seller fraudulently concealed information, the benefit would be lost.

The Court accordingly holds that, because there was fraudulent concealment on the part of the Seller, the one year period of limitation for the bringing of indemnification claims has been abrogated and the present action is timely brought. The Court's conclusion on this point renders it unnecessary to evaluate whether, if the disputed language in the Asset Purchase Agreement were found to be just a tolling provision, the Plaintiff is guilty of having rested on its rights in the face of "storm clouds" sufficient to have alerted it to the claims raised herein. The Court will therefore move to the issue of damages.

### C. Damages

In any breach of contract action, the plaintiff has the burden of proving damages resulting from the breach. *See Safeguard Scientifics, Inc. v. Liberty Mutual Ins. Co.*, 766 F.Supp. 324, 334–35 (E.D.Pa.1991) (*citing Spang & Co. v. United States Steel Corp.*, 519 Pa. 14, 25, 545 A.2d 861, 866 (1988)). Moreover, a plaintiff must show that it is capable of establishing damages to a reasonable certainty. *See Gordon v. Trovato*, 234 Pa.Super. 279, 286, 338 A.2d 653, 657 (1975) This principle extends, of course, to contract actions predicated upon a breach of warranty. *AM/PM Franchise Association v. Atlantic Richfield Company*, 526 Pa. 110, 129, 584 A.2d 915, 925 (1990); *Moskowitz v. Flock*, 112 Pa.Super. 518, 523, 171 A. 400, 402 (1934).

As noted, *infra*, the scope of the Seller's indemnification obligation is set forth at Paragraph 14.B. of the Asset Purchase Agreement as follows:

> B. Indemnification by the Seller. Seller agrees to indemnify and hold the Purchaser and its successors and assigns harmless in respect of any and all claims, losses, damages, liabilities, and expenses (including, without limitation, settlement costs and legal, accounting, and other expenses in connection therewith) (collectively, the "Damages") incurred by the Purchaser and its successors and assigns . . .

While the above text of the Asset Purchase Agreement is clear, the evidence offered by the parties on the question of damages was anything but clear. On this score, the Court notes at the outset that the record evidence, vis-a-vis, damages is somewhat difficult to comprehend in its entirety, and is totally irreconcilable as well. Indeed, the contentious litigants sometimes myopic views are nowhere more readily apparent than in this context, as they are at the proverbial "polar extremes" in their respective damages calculations. In this regard, the Plaintiff argues that it has sustained damage of approximately $4,000,000, while the Defendants argue that the Plaintiffs sustained no damage whatever, and in fact underpaid for the assets sold to it by over $1,000,000. The startling dichotomy in their positions renders the Court's evaluation of the damages question the more difficult.

The Plaintiff advances two separate theories with respect to damages: 1) out of pocket losses (i.e., restitution) and 2) future lost profits. In the former respect, the Plaintiff's position is at least straightforward. The Plaintiff itemizes its damages as follows:

- The price paid under the Asset Purchase Agreement ($2,482,040.12);
- The interest and charges paid to PNC Bank to finance the sale ($350,553.00);
- The amount paid under the Consultation Agreement ($116,668.00);
- The amount paid under the Noncompetition Agreement ($46,668.00);
- The rent paid under the Lease Agreement ($493,093.00);
- Other expenses including legal, accounting, appraisal, and Phase I environmental fees ($42,828.24);
- The costs and expenses of this litigation.

Excluding an additional claim for the attorneys fees and costs incident to this litigation, the Plaintiff's "out of pocket" damage claim totals $3,531,850.36. In an alternative calculation, the Plaintiff estimates its expectancy, or lost profits damage to be $4,215,000.

In support of its damage claims, the Plaintiff offered the expert testimony of Robert Wheeler, a management consultant with 25 years experience in handling "crisis" or "turnaround" engagements. On the subject of out of pocket losses, Mr. Wheeler opined that if one to were assume the loss of UARCO business, and therefore exclude that business which Keybis did with UARCO for purposes of determining the value of the Company when it was purchased by ECF in 1997, one would arrive at value of just $222,000. Mr. Wheeler came to this particular figure by first assuming a certain level of annual sales to UARCO for years 1995 through 1997, then deducting these sales from Keybis' revenues for the same years in order to arrive at revised figures for earnings before interest, taxes depreciation, and amortization (EBITDA). His calculations resulted in a reduction in average EBITDA from $897,000 to $74,000 for the years in question. Mr. Wheeler next assumed a multiplier of three years to be appropriate, and thereupon multiplied $74,000 by three to arrive at his sale date valuation of $222,000.

In Mr. Wheeler's view, no reasonable, informed party would have purchased Keybis on these facts, because without UARCO's business the Company could not operate profitably, and in fact the transaction could not even have been consummated, insofar as it depended on bank financing, as this one did, because no lender would loan under such circumstances. After identifying the above components of the Plaintiff's out of pocket loss claim, Mr. Wheeler opined that to restore the Buyer to the position it would have been in had the transaction not taken place, the entirety of the itemized sums should be assessed as damages.

In calculating estimated lost future profits, Mr. Wheeler assumed that Keybis had EBITDA of $843,000 for fiscal years 1995 through 1997. He further assumed that five years was an appropriate number of years to measure lost profits in this context, because the Buyer's bank loan had a five year term, as did Add Anderson's noncompetition agreement. Wheeler then simply multiplied the two numbers together and arrived at lost profit damages of $4,215,000. Mr. Wheeler described this methodology as the "contribution margin" technique and testified that it is a reliable, and indeed the only, technique used in the preparation of profit forecasts.

The Defendants, as noted, hold a decidedly different view on the question of

damages. Testifying on behalf of the Defendants was David Glusman, a certified public accountant with many years of experience in the areas of business valuation and lost profit analysis. Mr. Glusman opined that the assets of Keybis in August 1997 were worth roughly $3,819,000, or about $1,100,000 more than the $2,700,000 that ECF paid for them. This valuation estimate was derived from his review of certain schedules, two of which he understood to have been prepared by John Randolph, but none of which were made part of the record herein. The schedules, he says, reflected the Buyer's own allocation of the $2,700,000 purchase price among the assets being acquired in the transaction. According to Glusman, approximately $1,500,000 had been allocated to property and equipment that were stated to have an orderly liquidation value of approximately $2,600,000, suggesting a substantial underpayment. On the strength of this, Glusman is of the view that the purchase price paid by ECF was reasonable, irrespective of the UARCO issue, and he implies that the Buyer in fact got a tremendous bargain.

With respect to a lost profits analysis, Mr. Glusman offered two different estimates. The first was based on a technique called "exponential smoothing," (a/k/a "financial smoothing") Under this approach future sales to UARCO were projected based on a weighted average of historical sales. Future lost profits were estimated after factoring in Keybis' historical gross profit margin, and deducting projected selling, general, and administrative expenses. The second method Mr. Glusman used to estimate lost profits was called "trend based regression analysis." Using this method, one also endeavors to predict future performance based on historical operations, but one places greater emphasis on statistically adjusting for deviations in the hope of obtaining a more accurate projection, albeit within a more narrow range. Glusman calculated lost profits for three years and arrived at $394,663 using the smoothing technique, and $506,299 using regression analysis.

The Court finds much of the evidence offered with respect to damages to be flawed or unhelpful and, as is frequently the case, concludes that the actual appropriate figure lies somewhere between the extremes to which the parties adhere.

With respect to out of pocket losses, each side, in the first instance, predicates its view on an assumption as to the true value of Keybis when it was sold to ECF. In this respect, Mr. Wheeler, as noted, views the Company as having been essentially worthless as it faced the loss of UARCO business. Mr. Wheeler is therefore of the view that all monies expended by the Buyer in connection with the acquisition should be returned to it. Mr. Glusman, conversely, appears to believe that the circumstances represented an arbitrage opportunity, whereby the Buyer could have closed on the purchase and immediately liquidated the assets for a million dollar profit. Neither of these contentions is at all persuasive.

Clearly the Company's assets had a certain value, even on a liquidation basis, and even assuming the future loss of UARCO's business. On this score the Court notes that the Company's assets consisted of substantial cash, accounts receivable, inventory and supplies, and property and equipment. Certainly it overstates the case to say that the Buyer got nothing for what it paid. The Court notes, moreover, that Chris Felker of Quick Tech was prepared to pay upwards of $2,000,000 for the company, and he was fully aware of the UARCO situation. In view of its obvious deficiencies the Court has accordingly attached little weight to Mr. Wheeler's opin-

ion as to the value of Keybis on sale to ECF.

It similarly overstates the case, however, to argue that without UARCO's business Keybis' assets had a value of $1,000,000 beyond what was paid for them. On this score, the Court notes that according to Mr. Glusman the high value estimate he assumed for the assets came from his perusal of documents allegedly prepared by Mr. Randolph. Mr. Randolph, however, did not testify at trial, (although there was no indication that he was unavailable) and the documents in question are not part of the present evidentiary record. As with Mr. Wheeler, Mr. Glusman's opinion as to valuation suffered due to certain skepticism the Court developed concerning his credibility. Of particular note, Mr. Glusman at one point endeavored to persuade the Court that the Buyer had no recoverable damage, with or without UARCO's business, because Moseman and Randolph were predestined to failure. In this respect Glusman noted their inexperience as operators of a business identical to Keybis, and stressed the fact that ECF was in technical default of various financial ratios under its loan documents prior to filing bankruptcy. Glusman's assertion that the venture was doomed was clearly wild speculation on his part. Indeed, it is difficult to overlook the bias in such an opinion, which was not only based entirely on hindsight, but which placed no weight on the catastrophic economic reversal represented by the loss of the Company's largest customer. As with Mr. Wheeler, the Court has attached little weight to Mr. Glusman's opinion as the value of Keybis on its sale to ECF.

Unfortunately, heavily or entirely discounting the expert testimony offered by the parties as to the value of the assets ECF bought from Keybis leaves very little competent evidence in the record from which to then arithmetically determine the Buyer's out of pocket damages with any degree of accuracy. The Court will therefore eschew this approach and focus instead on lost future profits as the measure of damages herein. Fortunately, in this vein there is significantly more reliable evidence in the record.[4]

"[ ]Pennsylvania [law] allows consequential damages in the form of lost profits to be recovered." *AM/PM Franchise v. Atlantic Richfield,* 526 Pa. 110, 119, 584 A.2d 915, 920 (1990) (citations omitted). "Lost profits are, in fact, the difference between what the plaintiff actually earned and what they would have earned had the defendant not committed the breach." *Id.* at 123, 584 A.2d at 922. "The ... mere uncertainty as to the amount of damages will not bar a recovery where it is clear that damages were the certain result of the defendant's conduct." *Standard Pipeline Coating v. Solomon & Teslovich, Inc.,* 344 Pa.Super. 367, 379, 496 A.2d 840, 846 (1985) *citing Pugh v. Holmes,* 486 Pa. 272, 297, 405 A.2d 897, 909–910 (1979).

As between the Plaintiff and the Defendants, the latter offered by far the more persuasive evidence as to lost profits. The Court begins, however, by noting deficiencies in the Plaintiff's evidence as to lost profits which have led Court to discount it.

---

4. This is the better course to follow in assessing damages for an equally if not more valid reason. Restitution, or return of out of pocket losses, is an equitable remedy employed as an alternative to the enforcement of a contract. *Reliable Tire Distributors, Inc. v. Kelly* *Springfield Tire Company,* 607 F.Supp. 361, 371 (E.D.Pa.1985) Where, as here, an adequate remedy at law exists in the form of a damage assessment based on future lost profits, the equitable remedy of restitution is unavailable.

The Plaintiff's expert, Robert Wheeler, by his own admission does not typically perform lost profit calculations as a part of his work, and he had never previously offered expert testimony on this topic. He had no prior experience with a client in the business forms industry, and his methodology for computing lost profits was of the most rudimentary sort. On the latter score, he simply assumed future average annual sales to UARCO at the rate of $2,500,000 per year. Then, taking the average annual EBIDTA figure he had calculated, he multiplied by five to arrive at lost profits in excess of $4,000,000. Significant flaws in this approach were exposed at trial. For example, Mr. Wheeler's assumption as to historical UARCO sales was inaccurate. His projection of future sales, on other hand, was based entirely on conversation in which John Randolph simply told him that he expected future UARCO sales at that level. His lost profits calculation, furthermore, did not take into account a decline in the selling expenses and overhead attributable to a decline in UARCO sales. Finally, Mr. Wheeler did no market analysis and was therefore unaware that the business forms industry is a mature industry in which sales volume was in general decline, and in which companies were shifting printing production facilities to direct mail advertising jobs. In sum, Mr. Wheeler's testimony as to lost profits was most unpersuasive, and the Court has accorded it virtually no probative weight.

Despite lingering reservation as to the credibility of Mr. Glusman, the evidence offered by the Defendants through Mr. Glusman in the area of lost profits was, in contrast, of substantially higher quality, and it provides a means by which to make a reasonably accurate assessment of ECF's future lost profit damages. In this respect, Mr. Glusman was well qualified to opine on the issue in question, each of his methodologies was sound, and his data was for the most part accurate. Of the two methods he utilized, the Court finds the trend based regression analysis to be the more reliable predictor and will therefore adopt that method for present purposes. That method, as noted, produced a damages estimate of $506,299 for a three year period. Notwithstanding its superiority to the Wheeler analysis, the Glusman analysis was not without apparent flaws. For instance, Mr. Glusman projected net loss profits for fiscal years 1998 through 2000, as follows:

| Fiscal Year | Projected UARCO sales | Projected UARCO shortfall | Projected UARCO Net Loss |
|---|---|---|---|
| 1998 | $2,261,200 | $ 976,480 | $ 85,586 |
| 1999 | $2,397,200 | $2,268,143 | $198,797 |
| 2000 | $2,533,200 | $2,531,911 | $221,916 |
| 3 Year Total | | | $506,299 |

As seen, Glusman's aggregate loss was based on assumptions as to actual UARCO sales over the period in question and an assumed shortfall. The actual sales, however, are assumed to have accrued evenly over the course of each year, when that clearly was not the case in fiscal year 1998. In that year, the large majority of UARCO sales occurred before the calendar year end sale of the American label division of UARCO to Standard Register. This fact skews the projected shortfall and lost profits estimate for 1998 by understating the devastating and *immediate* effect which the loss of UARCO business had on the Company. Arguably one should begin the entire analysis with fiscal year 1999 as the base year. At a minimum, it appears that a more accurate loss profits estimate for fiscal year 1998 would be closer to that which is estimated for fiscal year 1999. The Court will therefore substitute the fiscal year 1999 estimate for Mr. Glusman's fiscal year 1998 estimate.

The Court also observes that for purposes of assessing lost profit damages, Mr. Glusman performed a three year calculation, while Mr. Wheeler used five years. Unlike Mr. Wheeler, who offered a rationale for his selection of five years, (5 year loan; 5 year non-competition agreement) Mr. Glusman said nothing whatever on the subject. Conspicuously, neither witness alluded to any industry or professional standard in support of their selection of a multiplier, nor have counsel for either party cited to any common law or statutory authority for the use of one particular term of years versus another. Considering all of the circumstances, the Court concludes that the most reasonable course to follow is to split the difference between the experts on this point, and to calculate lost profit damages for a term of four years. For the fourth year the Court will use the final year estimate calculated by Glusman (f/y 2000—$221,916) since by that time UARCO sales had essentially dropped to zero. The foregoing produces lost profit damages, as follows:

| Fiscal Year | Damages |
| --- | --- |
| 1998 | $198,797 |
| 1999 | $198,797 |
| 2000 | $221,916 |
| 2001 | $221,916 |
| GRAND TOTAL | $941,526 |

Judgment in favor of the Plaintiff and against Defendant Keybis will be entered in the above amount. A follow-up evidentiary hearing will be scheduled, however, for purposes of assessing attorneys fees and costs also includible as damages under ¶ 14.B of the Asset Purchase Agreement. With that, the Court turns lastly to the question of whether this judgment should also be entered jointly and severally against Add B. Anderson.

### D. Participation Liability on the Part of Add B. Anderson

It is a well established general rule that one who deals with a corporation, knowing it to be such, cannot enforce individual liability against the officers or agents who act for the corporation. *Bala Corporation v. McGlinn,* 295 Pa. 74, 79, 144 A. 823, 824 (1929). Revisiting this case in *Wicks v. Milzoco Builders, Inc.,* 503 Pa. 614, 621–22, 470 A.2d 86, 90 (1983), the Pennsylvania Supreme Court paused to observe that while individual liability could not attach to a corporate officer or agent in an action brought against the corporation in assumpsit, corporate officers could be held liable for their own tortious actions. Such liability could attach, said the Court, under the participation theory of liability. *Id.* at 621, 470 A.2d at 90. Under this theory liability is imposed on the corporate officer as an actor rather than as an owner. *See Donsco, Inc. v. Casper Corporation,* 587 F.2d 602, 606 (3d Cir.1978). The participation theory of liability is not a cause of action in and of itself, but rather a form of derivative liability. *See Stanley v. Exxon Corp.,* 824 F.Supp. 52, 54 (E.D.Pa.1993) ("The theory is a means of imposing personal liability against an individual for the individual's participation in tortious conduct [of the corporation]; it is not a cause of action in and of itself.") In this respect, the Pennsylvania Supreme Court in *Wicks* was careful to distinguish between an action to pierce a corporate veil for purposes of imposing liability on a corporate officer and the assertion of participation liability. The Court observed, as follows:

[ ]There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation. Where the court pierces the corporate veil, the owner is liable because the cor-

poration is not a bona fide independent entity; therefore, its acts are truly his. Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity. *See Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978).

503 Pa. at 621, 470 A.2d at 89–90

For the most part, cases involving the assertion of participation liability have dealt with circumstances where the corporation itself has been accused of tortious conduct. One notable exception in the decision in *Newbridge Securities, Inc. v. Lloyd Securities, Inc.*, 1990 WL 145438 (E.D.Pa.). In *Newbridge*, the Court noted that although the *Wicks* case had sounded in trespass, the participation theory of liability had been used where the cause of action against the corporation involved was a breach of contract. *Id.* at *2 *citing Village at Camelback Property Owners Assn., Inc. v. Carr*, 371 Pa.Super. 452, 538 A.2d 528. (1988)

The Defendants argue that *Newbridge* was incorrectly decided in that its reliance on *Village at Camelback* is misplaced. In *Village at Camelback*, say the Defendants, the Superior Court concluded that the Plaintiff's Complaint should not be dismissed because it sufficiently pled that a corporate principal had participated in the tortious acts of the corporation. This is true, insofar as it goes. The Superior Court did more than this however.

The Complaint in *Village at Camelback* contained numerous counts, some in contract, some in tort, and one for an alleged RICO violation. The Court refused to dismiss those portions of the Complaint

against the corporate principal which sounded in contract observing that in the Complaint the Plaintiff had pled certain facts alleging that the principal undertook personal obligations in connection with certain warranties at issue and was therefore susceptible to personal liability under the participation theory. On this score, the Court said:

> We find that appellant has, in the most general terms, set forth a claim against Carr individually for breach of warranties personally extended by Carr. Read as a whole, the complaint alleges that legally binding promises and representations were made by Carr in his individual capacity, that those promises and representations were not fulfilled or were untrue, and that the members of the association relied upon those promises and representations to their detriment. We find these allegations, which we must at this juncture accept as being true, minimally sufficient to state a claim against Carr individually.

371 Pa.Super. at 464, 538 A.2d at 534.

The Court in *Village at Camelback* did not preclude the possibility that at trial the Plaintiffs could establish that the corporation principal could be found liable, although it observed that proof of the wrongful conduct alleged on his part would have to be shown. Similarly, for instance, the Court in *A & F Corp. v. Bown*, 1996 WL 466909 (E.D.Pa.) noted that liability under the participation theory would not lie in a contract action, *unless* the corporate officer extended promises in his individual capacity. *Id.* at *5

The caveats expressed in *Village at Camelback* and *A & F Corp.* are important ones. These decisions do not hold that liability under the participation theory can never attach in a breach of contract case. To the contrary, these cases hold that if certain circumstances are present such lia-

bility can attach. It deflects attention to couch the inquiry, as the defendants do, in terms of a litmus type test; i.e., saying that in tort cases the participation theory of liability is viable, but in contract cases it is not. The proper inquiry is whether the necessary predicate; i.e., the extension of promises by the corporate officers, individually, is present in a contract action against the corporation. This is the relevant question herein. Considering this question, the Court finds the assertion of participant liability is viable herein because the aforesaid predicate fact has been established.

The Court will not repeat here the intricate factual setting in which this case arises, but will reiterate that the finding of liability against the corporate defendant Keybis, is based on fraudulent misrepresentations and concealments attributable to the corporation through the acts and omissions of its president and sole shareholder, Add B. Anderson. Standing alone, the argument could be made that the tortious conduct which constituted a breach of the Asset Purchase Agreement does not constitute the act of Add B. Anderson, individually, for purposes of participant liability. It is not necessary to resolve that question, however, because the Corporations's breach does not stand alone. Rather, there is ample evidence upon which to find that Mr. Anderson acted and extended promises on his own. The companion consulting and non-competition agreements between the Buyer and Add B. Anderson are testament to this. These agreements were an integral and inseparable part of the sale transaction. They are detailed in the Asset Purchase Agreement and are just as much a part of it as the recitation of the purchase price. The transaction was, as is said in the vernacular, a package deal. By virtue of the consulting and non-competition agreements, Add B. Anderson had a substantial, direct, and individual pecuniary interest in the transaction separate and distinct from his interest as the shareholder of Keybis; which is to say that in negotiating and consummating the transaction, Add B. Anderson's role was that of an actor, as well as an owner. The promises in the agreement, including the fraudulent misrepresentations and concealment identified herein are thus properly attributable to both the corporation and Add B. Anderson individually. That being the case, the judgment against Keybis herein shall also be entered jointly and severally against Add B. Anderson.

An appropriate Order follows.

## ORDER

AND Now, it is hereby:

ORDERED, that the for the reasons set forth in the within Opinion, Judgment shall be and hereby is entered in the amount $941,526 in favor of the Plaintiff, and jointly and severally against the Defendants, Keybis Corporation and Add B. Anderson, Jr.; and it is further:

ORDERED, that a follow-up hearing to consider an assessment of additional damages for Plaintiff's attorneys fees and costs, shall be and hereby is scheduled for January 29, 2004, 10:00 a.m., United States Bankruptcy Court, 900 Market Street, 2nd Floor, Courtroom No. 4, Philadelphia, Pennsylvania, 19107.